IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DENNIS K. T.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 17-cv-863-CJP[2] |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in November 2013, alleging disability as of November 12, 2012. After holding an evidentiary hearing, ALJ Diane Erickson denied the application on August 25, 2016. (Tr. 13-26). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely

---

[1] In keeping with the court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 27.

complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.  The ALJ failed to develop the record by obtaining medical records reflecting treatment from an orthopedic specialist.

2.  The ALJ did not properly consider plaintiff's RFC in that she ignored medical records indicating that he had atrophy of his quadriceps muscles and swelling in his leg and foot, requiring him to elevate his legs.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes and regulations. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot

perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Murphy v. Colvin,* 759 F.3d 811, 815 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Erickson followed the five-step analytical framework described above. She determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He was insured for DIB through December 31, 2017.

The ALJ found that plaintiff had severe impairments of chronic kidney disease; obstructive sleep apnea; Morton's neuromas, status-post right foot excision/surgery, in addition to findings of plantar nerve lesion with subsequent wound debridement; degenerative joint disease/arthritis of the bilateral knees, status-post surgeries; patellofemoral disorder of the left knee; degenerative joint disease of the right foot with hallux rigidus; cervical radiculopathy; degenerative disc disease of the lumbar spine, status-post remote surgery; and coronary artery disease.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level with some physical limitations. Based on the testimony of a vocational expert, the ALJ concluded that plaintiff was able to do his past work as an insurance adjuster-property/claims processor.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff. Because plaintiff's second point

concerns only the need to elevate his legs, the Court will focus on medical records relevant to that argument.

   1.   **Agency Forms**

Plaintiff was born in 1952. He was 60 years old on the alleged date of disability. (Tr. 193). He had worked as an insurance adjuster and property adjuster from 1997 through 2012. (Tr. 198-199).

In December 2013, plaintiff said he spent his days looking on-line for employment, taking on-line self-study courses, and watching TV. He did simple household repairs and mowed the grass when able. (Tr. 207-208). He said he had to rest after walking two blocks. He had difficulty lifting, bending, squatting, standing, walking, kneeling, and climbing stairs due to his pain in his neck, lower back, and knees, and nerve damage in his foot. (Tr. 211).

   2.   **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in March 2016. The ALJ asked the attorney whether there was additional evidence. Counsel said he needed to obtain records from Dr. McCormick at Washington University/Barnes Hospital regarding surgery to remove a neuroma from plaintiff's foot. The ALJ said she would hold the record open for receipt of that evidence. (Tr. 34-35).

Plaintiff testified that he was 5'11" tall and weighed about 230 pounds. (Tr. 37). He and his wife had an "in-house travel agency" which had not made any

money but enabled them to go on trips with their commissions. They had a trip to St. Lucia coming up. He worked 10 to 20 hours a week, depending on demand, doing on-line research and booking trips. He belonged to the Shriners and was in a swing dance unit. (Tr. 42-43).

Plaintiff did some work inspecting roofs in 2015. He worked full-time for 3 or 4 months but had to quit because it was too much for his knees. (Tr. 43-44).

Plaintiff testified that, on a normal day, he checked emails and did on-line research regarding travel. He did whatever he could around the house to help, including dishes, laundry, maintenance of his hot tub, and yard work. He and his wife belonged to a swing dance club. He was on the board of that group. He and his wife also participated in Shriners' activities. (Tr. 49-51).

Plaintiff had surgery to remove a neuroma from his right foot. The surgery was re-done the previous December. He testified that his foot was doing well with "a little discomfort." (Tr. 45).

Plaintiff had received "gel injections" in his knees on March 4, 2016. The injections decreased his pain but he still had limited function. His knees were "basically filled with fluid." His doctor had given him a home exercise program for his knees. Plaintiff's counsel asked him "As you engage in your exercise program currently, how are you doing the day after you've done your exercises?" Plaintiff replied that he was sore. Counsel asked him how he positioned himself on those days. Plaintiff replied "In the recliner with my ice packs on my knees and my legs elevated." (Tr. 52-54).

A vocational expert (VE) also testified. The ALJ asked her a hypothetical question which corresponded to the ultimate RFC findings. The VE testified that this person could do plaintiff's past work. (Tr. 58-60).

### 3. Medical Records

Plaintiff's primary care physician, Dr. Prager, noted in April 2012 that he was being seen by an orthopedic specialist for some left knee pain. He noted no edema in the extremities. (Tr. 326-327). In May 2012, plaintiff was to have surgery to repair a torn ligament in the left knee. Dr. Prager saw him for a pre-operative evaluation. He again noted no edema in the extremities. (Tr. 334-336). On November 6, 2012, plaintiff asked Dr. Prager to refer him for a second orthopedic opinion because he had persistent pain and swelling in his left knee since the arthroscopic surgery. On exam, he had swelling over the left knee with a good range of motion. He was referred to Dr. William Schroer. (Tr. 358-360).

Plaintiff alleges that he became disabled as of November 12, 2012.

In March 2013, plaintiff told Dr. Prager that he still had pain in his left knee and now had pain in the right knee as well. He said that dancing irritated his right foot and he got numbness between the second and third toes. On exam, he had edema over the left knee with mild effusion and good range of motion. Dr. Prager referred him to a new orthopedist, Dr. Fox, and noted that he could choose to see Dr. Schroer, to whom he had been previously referred. (Tr. 370-372).

Plaintiff told Dr. Prager in September 2013 that his knee pain had completely

resolved after an orthopedist gave him steroid injections. He still had foot pain between the second and third toes for which he may have surgery from a foot specialist. There was no edema on exam. (Tr. 392-393). The next month, Dr. Prager noted he had a normal gait. (Tr. 409).

Dr. Taylor, a podiatrist, diagnosed a neuroma between the second and third toes on the right foot and gave plaintiff an injection on October 31, 2013. (Tr. 313-314).

Plaintiff told Dr. Prager in November 2013 that he had improvement in the pain and numbness between his toes since a podiatrist gave him an injection. He had no edema in the extremities on exam and his gait was normal. (Tr. 419).

Dr. Vittal Chapa performed a consultative examination on February 20, 2014. Plaintiff was able to bear weight and ambulate without any ambulatory aids. His gait was normal. There was no joint swelling, heat, redness or thickening. The left knee had a full range of motion, and the range of motion of the right knee was limited. Both knee joints were stable with no swelling. (Tr. 436-443).

Plaintiff received several more injections for the neuroma in his right foot from Dr. Taylor from January to June 2014. During that time, he had gone on a cruise and done okay. It felt like he had a rock under the ball of his foot. After the last injection, Dr. Taylor recommended shoes with more room in the toe area, rest, ice, elevation, and compression. He also recommended exercises. (Tr. 445-459).

In September 2014, plaintiff saw Dr. Jeremy McCormick, an orthopedic specialist at Washington University. Plaintiff filled out a questionnaire in which he

stated he was a swing dancer and could not dance anymore without his right foot hurting and throbbing. He was working part time as an adjustor inspecting roof claims, which was "almost impossible." (Tr. 681). Dr. McCormick diagnosed a second webspace neuroma. (Tr. 667). Dr. McCormick performed a surgical excision of the neuroma on October 31, 2014. (Tr. 653). The surgical wound was slow to heal and became infected. This was treated with irrigation and debridement in December 2014. In February 2015, the wound was completely healed and plaintiff was able to weight bear. He had been scuba diving and was not having any issues. (Tr. 633-652).

Plaintiff began receiving healthcare at a Veterans Administrating facility in January 2015. He was seen for a number of conditions. As is relevant here, on the first visit, he denied joint pain or swelling. He was still non-weight bearing because of his right foot surgery. (Tr. 534.) He was seen by Dr. Evans, an orthopedic specialist, in July 2015 for pain in his knees and pain over the first metatarsophalangeal joint of the right foot. On exam, he had a good range of motion of both knees with some crepitus in the left knee. He had some mild swelling around the first metatarsophalangeal joint. He had some atrophy of the quads, more on the left. Dr. Evans diagnosed patellofemoral disorder of left knee, degenerative arthritis of the right knee, and hallux rigidus of the right foot. He injected the first metatarsophalangeal joint and the left knee, and gave plaintiff some exercises to strengthen his quads. He also ordered a brace for the left knee. (Tr. 495-496).

He was given an appointment to see Dr. Evans again on March 4, 2016, but there is no record of that appointment in the transcript. (Tr. 591).

### **Analysis**

Plaintiff first argues that the ALJ filed to develop the record in that she did not obtain records from an orthopedist who treated him from April 2012 through September 2013. That argument is a nonstarter.

Plaintiff was represented by counsel at the administrative level. At the hearing, the ALJ gave counsel the opportunity to submit additional evidence. Counsel identified only Dr. McCormick's records. Counsel made no mention of the orthopedist's records from 2012 and 2013. Because plaintiff was represented by counsel, the ALJ was entitled to assume that he was putting his strongest case forward. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).

Plaintiff's second argument is that the ALJ ignored evidence that his quads are atrophied and that his legs swell, requiring him to elevate his legs. This argument fails because plaintiff did not claim that he had to regularly elevate his legs at the agency level.

Plaintiff correctly points out that Dr. Evans found "some atrophy of his quads more on the left than the right." (Tr. 496). He argues that this evidence supports his claims of lower extremity pain and swelling which requires him to sit "in a recliner with icepacks on his knees throughout the day to elevate his legs to relieve pain and swelling." Doc. 16, pp. 6-7.

Plaintiff's argument here is unmoored from his testimony before the ALJ.

Plaintiff nowhere claimed that he had to sit in a recliner throughout the day with his legs elevated *on a regular basis*. Rather, his only testimony about elevating his legs and applying ice referred to his condition on the day after he did his knee exercise program. In fact, as the ALJ correctly noted, plaintiff engaged in a number of activities including yard work, household chores, volunteer work with the Shriners, swing dancing, travel, and scuba diving. (Tr. 19-20).

Further, the evidence cited by plaintiff in his brief consists of isolated references in the medical records to swelling. Many of those references are to swelling in plaintiff's foot. Doc. 16, pp. 8-9. But, plaintiff never testified that he had to elevate his legs because of swelling in his foot. He does note that Dr. Taylor, the podiatrist, recommended elevation in June 2014, but that predated the surgery to remove the neuroma. Plaintiff testified that the surgery was successful and he had only a little discomfort at the time of the hearing.

It is true that the ALJ did not specifically mention the finding of atrophy of the quadriceps. However, the ALJ did note that Dr. Evans recommended exercises to strengthen the quads. And, again, at the agency level, plaintiff only claimed that he had to elevate his legs and ice his knees after he did his knee exercise program.

The claim plaintiff makes here is not one that he made at the agency level. The ALJ cannot be faulted for failing to consider an allegation that he did not make.

Plaintiff has not identified any errors requiring remand. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the

ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). ALJ Erickson's decision is supported by substantial evidence, and so must be affirmed.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Erickson committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   June 27, 2018.**

                                              <u>s/ Clifford J. Proud</u>
                                              **CLIFFORD J. PROUD**
                                              **UNITED STATES MAGISTRATE JUDGE**